**PERRY SYLVESTER v. YOUNG TINDALL,** as Sheriff of Osceola County, Florida.

18 So. (2nd) 892
July 7, 1944

June Term, 1944
En Banc

*George P. Garrett,* for appellant.

*J. Tom Watson,* Attorney General, and *John C. Wynn,* Assistant Attorney General, for appellee.

BROWN, J.:

This case is before us on appeal from an order of the Circuit Court in habeas corpus proceedings remanding the appellant to the custody of the appellee, sheriff of Osceola County.

This case involves the question of whether or not the constitutional amendment of 1942, purporting to amend Article IV of the Constitution by adding thereto Section 30, was lawfully voted on and adopted by the people. This amendment was proposed by the Legislature in May of 1941, and, if lawfully adopted, created a commission to be known as the "Game and Fresh Water Fish Commission," and stated the purposes for which it was created and vested it with certain powers and duties.

Appellant also attacks the validity of Rules 3, 9 and 13 adopted by the commission, as well as the sufficiency of the evidence introduced before the circuit judge to show a violation of said rules. These questions were raised in the trial court and ruled upon adversely to contentions made by the appellant.

We do not think it proper or necessary for us to rule upon the question of the sufficiency of the evidence. It certainly cannot be said that there was an entire lack of evidence tending to prove the information, consisting of two counts, which had been filed by the prosecuting attorney of Osceola County. We might remark in passing that there *was* substantial evidence introduced before the circuit judge in support of the information. The general rule is that the object of the writ of habeas corpus is not to determine whether a person has committed a crime, or the justice or

injustice of his detention on the merits, but to determine whether he is legally imprisoned or restrained of his liberty. The use of the writ of habeas corpus to test the sufficiency of the evidence upon which a charge may have been based is not sanctioned by this Court; nor is that writ available to review the sufficiency of a substantive defense. State v. Vasquez, 49 Fla. 126, 38 So. 830; White v. Penton, 92 Fla. 837, 110 So. 533; Hass v. Hinkle, 216 U. S. 462, 54 L. Ed. 569; Atkinson v. Powledge, 123 Fla. 389, 161 So. 4; State ex rel. Williams v. Coleman, 131 Fla. 872, 180 So. 360; Shelton v. Coleman, 136 Fla. 625, 187 So. 266; Skipper v. Schumacher, 124 Fla. 384, 169 So. 58.

Appellants first contention is that the ballot was insufficient to comply with Section 1 of Art. XVII of the Constitution as to the manner in which a proposed amendment shall be submitted to the electorate of the State for approval or rejection. The ballot reads as follows:

No. 3
CONSTITUTIONAL AMENDMENT
ARTICLE IV

To amend Article IV of the Florida Constitution by adding section 30 providing for conservation of birds, game, fur bearing animals and fresh water fish, creating a commission and conferring powers to administer laws for such purposes.

| ( ) For the Amendment |
| --- |
| ( ) Against the Amendment. |

Section 1 of Art. XVII of our Constitution does not prescribe just how a constitutional amendment shall be submitted to the electorate. Nor does the Constitution say anything about the form of the ballot. It does provide the manner or procedure by which the Legislature may propose amendments, and it also provides that an amendment so proposed by the Legislature shall be "published in one newspaper in each county where a newspaper is published for

three months immediately preceding the next general election of representatives," at which election the same shall be submitted to the electors of the State for approval or rejection. If a majority of the electors voting upon the amendments at such election, shall adopt the amendments; the same shall become part of the Constitution. The proposed amendments shall be so submitted as to enable the electors to vote on each amendment separately."

It is not denied that the amendment here before us was published in each county for three months as provided by Section 1 of Art. XVII, but it is contended that the form of the ballot was not sufficient to put the electorate on notice as to just what they were voting upon. We do have a statute, Sec. 99.16, FS 1941, which provides that "the substance" of each amendment shall be printed on the ballot, followed by the phrase "For the amendment" and also by the phrase "Against the amendment," with sufficient blank space thereafter for the placing of the symbol "X" to indicate the voter's choice, except that when voting machines are used the amendment shall be in the form prescribed in the provision of the law relating to the use of voting machines, as to which latter, see Section 100.01 et seq., FS · 1941. Furthermore, Section 99.17, FS 1941, provides that whenever an amend-' ment or amendments to the Consttution are to be voted upon at any election, the county commissioners of each county shall have such amendment or amendments printed in clear and legible type and a copy thereof conspicuously posted at each voting precinct in such county upon the day of the election, such printed amendments to be furnished to them by the Secretary of State.

We are inclined to the opinion that the form of the ballot pertaining to this particular amendment was sufficient to put the electorate on notice as to the amendment they were voting upon, especially in view of the three months publication of the amendment and the posting of a complete copy of it in each voting place. See Collier v. Gray, 116 Fla. 845, 157 So. 40, and 11 Am. Jur. 638, 639. But it is not really necessary for us to rule upon this question here.

While it is true that the procedure set forth in Section

1 of Art. XVII is mandatory and should be followed, (Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963, Gray v. Childs, 115 Fla. 816, 156 So. 274) this Court has recognized the almost universal rule that once an amendment is duly proposed and is actually published and submitted to a vote of the people and by them adopted without any question having been raised prior to the election as to the method by which the amendment gets before them, the effect of a favorable vote by the people is to cure defects in the *form* of the submission. It was because of the recognition of this rule in the case of West v. State, 50 Fla. 154, 39 So. 412, that Governor Gilchrist, in the case of Crawford v. Gilchrist, supra, obtained an injunction against the Secretary of State to prevent the latter's publication of an initiative and referendum proposal that was then being published, upon the ground that the Legislature had not proposed the amendment in accordance with the constitutional provision. This question is very ably discussed in an opinion written for this Court by Mr. Justice DAVIS in the case of State ex rel. Landis v. Thompson, 120 Fla. 860, 163 So. 270. It has been held, however, by the Supreme Court of Alabama that a serious violation of the constitutional requirements for proposing an amendment to the Constitution, such as the delegation by the Legislature to the Governor of the power to call the election on the amendment and fix the date of the election, which was deemed contrary to the constitutional provision, was not cured by the adoption of the amendment by the people, and that therefore the amendment did not become a part of the Constitution. This was an unusual case and resulted in a four to three decision, and all phases of this question were very carefully discussed in both the majority and minority opinions. See Johnson v. Craft, 205 Ala. 386, 87 So. 375. See also 12 C.J. 688 et seq. But in view of our own decisions, above cited, we are satisfied that if there was any irregularity in the form of the ballot with reference to the amendment now before us, it was not a serious one and was cured by the adoption of the amendment by the people at the General Election in November, 1942.

Appellant contends that the constitutional amendment, now Section 30 of Art. IV of the Constitution, did not confer

upon the Game and Fresh Water Fish Commission the power or authority to adopt rules or regulations, especially where such rules or regulations would conflict with existing local laws applicable to Osceola County, and that this lack of authority was not cured by the adoption of Chapter 21945, General Laws of 1943, which took effect June 5, 1943, because that statute was a general statute, and a general act will not be held to repeal a special or local act unless the general act is a general revision of the whole subject, or unless the two acts are so repugnant as to indicate the legislative intent that the general act should repeal the local or special act.

It appears that a local act was adopted by the Legislature of 1941, Chapter 21449, which, subject to a referendum vote, forbade commercial fishing in the lakes of Osceola County, but at the general election on November 3, 1942, the vote was 805 against to 705 for the closing of the lakes of the county to commercial fishing. At the same session of the Legislature a local act, Chapter 21450, Special Acts of 1941, was adopted, which allowed commercial fishing in certain lakes in Osceola County, including Lake Kissimmee, under a license from the Board of County Commissioners, and that under this act a license was duly issued to the Kissimmee Fishing Company, and appellant was acting for, and an employee of the Kissimmee Fishing Company when, on September 1, 1943, while fishing with a drag seine net in Lake Kissimmee, he was arrested under the provisions of Chapter 21945 and the Rules and Regulations of the Game and Fresh Water Fish Commission, adopted June 14, 1943, effective as of July 24, 1943.

Sections 1, 4 and 7 of the constitutional amendment, now Section 30 of Art. IV, are pertinent to be considered here. These Sections read as follows:

"1. From and after January 1, 1943, the management, restoration, conservation, and regulation, of the birds, game, fur bearing animals, and fresh water fish, of the State of Florida, and the acquisition, establishment, control, and management, of hatcheries, sanctuaries, refuges, reservations, and all other property now or hereafter owned or used for such purposes by the State of Florida, shall be vested in a

commission to be known as the Game and Fresh Water Fish Commission. Such Commission shall consist of five members, one from each congressional district, as existing on January 1, 1941, who shall be appointed by the Governor, subject to confirmation by the Senate. The members so appointed shall annually select one of their members as Chairman of the Commission."

"4. Among the powers granted to the Commission by this Section shall be the power to fix bag limits and to fix open and closed seasons, on a state-wide, regional or local basis, as it may find to be appropriate, and to regulate the manner and method of taking, transporting, storing and using birds, game, fur bearing animals, fresh water fish, reptiles, and amphibians. The Commission shall also have the power to acquire by purchase, gift, all property necessary, useful, or convenient, for the use of the Commission in the exercise of its powers hereunder."

"7. The Legislature may enact any laws in aid of, but not inconsistent with, the provisions of this amendment, and all existing laws inconsistent herewith shall no longer remain in force and effect. All laws fixing penalties for the violation of the provisions of this amendment and all laws imposing license taxes shall be enacted by the Legislature from time to time."

Chapter 21945, General Laws of 1943, was manifestly enacted in aid of and to implement the constitutional amendment. It authorized the Game and Fresh Water Fish Commission to exercise "the powers, duties and authority granted by Section 30, Art. IV, of the Constitution of Florida, by the adoption of rules, regulations and orders, or otherwise in its discretion, which said rules, regulations and orders shall be promulgated in the manner following:", setting forth the procedure to be adopted by the Commission in promulgating its rules, regulations and orders and the publication of same and the filing of a certified copy in the office of the Secretary of State and also in the office of each county judge in the State. It also provides that such rules and regulations, when duly certified by the Secretary of State and by the director of the Commission under the Commission's seal shall be admis-

sible in evidence in all cases and proceedings before all courts, boards and commissions of this State, and shall become effective thirty days after the filing of the certified copy in the office of the Secretary of State.

Section 6 of the Act (Ch. 21,945) provides that any person violating any provision of the Act, or of any rule, regulation or order adopted by the Game and Fresh Water Fish Commission pursuant to Section 30, Art. IV of the Constitution, shall be guilty of a misdemeanor.

Rule 9, of Rules and Regulations adopted by the Commission, or so much thereof as is pertinent here, reads as follows:

"Rule 9. Lawful Methods of Taking Fresh Water Fish. It shall be unlawful to take or attempt to take any fresh water fish from the fresh waters of the State of Florida by means of any device except hook and line, rod and reel, bob, spinner or troll. (Supersedes Section 372.20 Florida Statutes 1941." And Rule 13 reads:

"Rule 13. Unprotected Species. Nothing in the above Rules shall apply to gar fish, catfish, mudfish or black fish, except that when these fish are taken by any method other than hook and line, rod and reel, bob, spinner or troll, the person or persons taking such fish shall be required to have a permit from the Game and Fresh Water Fish Commission setting out the method to be used and the locality where such fish are to be taken."

Appellant was informed against the the County Prosecuting Attorney for the violation of these two rules, the information containing two counts.

The specific question presented is whether or not the local act, chapter 21,450, Special acts of 1941, which legalized fishing with a drag seine net in Osceola County, was repealed by the adoption and promulgation of the above quoted rules of the Commission.

While the amendment does not expressly confer upon the Commission the authority to adopt rules and regulations designed to carry into effect the purposes of the amendment, it may well be that such authority could be implied from the language of the amendment itself. Thus the first section provides that after January 1, 1943, "the management, res-

toration, conservations and regulation" of the birds, game, etc., and fresh water fish of the State of Florida "shall be vested" in the Commission created by the amendment, and, in section 4, it says that "among the powers granted to the Commission shall be the power to fix bag limits and to fix open and closed seasons, on a state-wide regional or local basis, as it may find appropriate, and to regulate the manner and method of taking, transporting, storing and using . . . fresh water fish," etc.

In his great opinion in McCullough v. Maryland, 4 Wheat, 316, 4 L. Ed. 579, Chief Justice MARSHALL used the following oft quoted sentence: "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional." So it was held in that case that the power of Congress to establish a banking corporation was not a distinct and sovereign power, but was a means of carrying into effect other powers which were sovereign and which were conferred by the Federal Constitution, and that the degree of the necessity for adopting such means was a question of legislative discretion and not one of judicial cognizance. So here it might be held that the authority of this Commission to adopt such rules and regulations as are necessary and appropriate to carry into effect the powers and purposes of the constitutional amendment here involved might, if necessary, be implied from the amendment itself.

But the constitutional amendment, in Section 4, expressly provides that the "Legislature may enact laws in aid of, but not inconsistent with, the provisions of the amendment, and all laws inconsistent herewith shall no longer remain in force and effect." Thus it may be said that the constitutional amendment authorized the Legislature to expressly confer upon the Commission the authority to adopt such rules and regulations as may be reasonably necessary and appropriate to the performance of their duties and the exercise of their powers in carrying into effect the purposes of the constitutional amendment as therein expressed. In an endeavor to enact a law "in aid of" the provisions of this constitutional

amendment, the Legislature adopted said Chapter 21,945, Acts of 1943, and, in so far as those portions of said Act which are here brought in question are concerned, we hold that it is valid and constitutional.

The contention that this Act is an unconstitutional delegation of legislative power is not tenable. It is true that the constitutional amendment and the statute, considered together, authorize the Game and Fresh Water Fish Commission to make rules and regulations which may over-ride, and, in effect, repeal statutes in conflict therewith, but that is the purpose and intent of both the constitutional amendment and the implementing statute. And this must have been the purpose of the Legislature itself when it proposed this amendment to our Constitution, and of the people when they adopted it. If the power thus conferred upon the Commission is legislative in its nature, it is nevertheless one that is constitutionally conferred. We may take judicial cognizance of the historical background of this amendment—the many years in which the Legislature had tried in vain to adequately deal with the subject matter of this amendment by local or special acts, (Ex parte Lewis, 101 Fla. 624, 135 So. 147) and the conviction finally arrived at by the Legislature and the people that this matter of game and fish conservation and regulation was a statewide problem and one that could only be properly solved by a long range program to be carried into effect by a State Commission—a new administrative department of the State Government—equipped with powers adequate to the purpose for which it was to be—and was—created.

The State has a sovereign right, and a consequent sovereign duty, in regard to this matter of game and fish conservation. In State v. Stoutamire, 131 Fla. 698, 179 So. 730, this Court, speaking through Mr. Justice WHITFIELD, said:

"There is a real distinction and difference between the right of the State in its lands and personal property and its right in fish in the public waters of the State. In its proprietary property it has absolute rights. In fish in the public waters the State has a sovereign right primarily and essentially of preservation, conservation and regulation for the people of the State, whose right is to take fish from the

public waters subject to the regulations imposed by the State for the benefit of the people of the State. People of the State may take fish from the public waters unless forbidden by law. They may not legally take proprietary property of the State unless authorized to do so by due course of law."

And this Court has long since recognized a similar principle with reference to wild animals. Thus in Harper v. Galloway, 58 Fla. 255, 51 So. 226, it was said:

"Under the common law of England the title to animals *ferae naturae* or game is in the sovereign for the use and benefit of the people, the killing or taking and use of the game being subject to governmental control and regulation for the general good. The power to control and regulate the killing and use of game was vested in the colonial governments of America and passed with the title to game in its natural condition to the several states as they became sovereigns, for the use and benefit of all the people of the states respectively, subject to any provision of the Federal Constitution that may be applicable to such control and regulation. The Constitution of the State does not forbid the passage of special or local laws upon the subject of game, and it contains no express provision relative to game; therefore the Legislature may by a duly enacted law make any provision within its discretion for the preservation and conservation of the game in the State for the use and benefit of the people of the State, by regulating the taking or killing and use of certain or all kinds of game in any part of the State and during any periods, where such laws do not deny to any one having rights in the premises the due process of law or the equal protection of the laws that are guaranteed to all persons by the State and Federal Constitutions."

And in Foster-Fountain Pkg. Co. v. Haydel, 278 U. S. 1, 73 Law ed. 147, 49 S. Ct. 1, the Supreme Court of the United States said:

"The authority of the state to regulate and control the common property in game is well established. Geer v. Connecticut, 161 U. S. 519, and cases cited at p. 528, 40 L. ed. 793, 16 Sup. Ct. Rep. 600. These and many other cases show that the State owns, or has power to control, the game and fish

within its borders not absolutely or as proprietor or for its own use or benefit, but in its sovereign capacity as representative of the people. In Geer v. Connecticut, the Court, speaking through Mr. Justice WHITE, said (p. 529): 'Whilst the fundamental principles upon which the common property in game rests have undergone no change, the development of free institutions has led to the recognition of the fact that the power or control lodged in the state, resulting from this common ownership, is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government, as distinct from the people, or for the benefit of private individuals as distinguished from the public good.' "

We have no doubt whatever of the right of the people to adopt this amendment to our Florida Constituion. It does not violate or come in conflict with any provision of the Federal Constitution, and certainly not that provision of the Federal Constitution which guarantees a republican form of government to every state. In so far as the constitutional amendment, implemented by the statute, confers upon the Commission the power to make rules and regulations appropriate to carrying into effect the purposes of the constitutional amendment, we have held in many cases that such power can be conferred upon commissions, boards and departments without violating Art. II of our Constitution distributing the powers of our state government into three grand divisions—the legislative—the executive and the judicial. It is true that this separation of the powers of government is fundamental to the very existence of our form of state and Federal governments and is one of the most important principles of government guaranteeing the liberty of the people. While we have held that there may be a certain blending of powers in administrative boards and commissions, in a broad sense we have preserved these separations of the powers of government, and the independence of each department, which is so vital to the freedom of our people from tyranny and oppression. This separation of powers, coupled with the fundamental individual rights which are guaranteed by our bill of rights prevents the exercise of

autocratic power and is essential to the perpetuity of our form of government. "Thus no department, not even the legislative, has unlimited power under our system of government." (State v. City of Stuart, 97 Fla. 69; 120 So. 335, 64 A.L.R. 1307.)

In many of our decisions, we have upheld the delegation by the Legislature to administrative boards of the power to make rules and regulations designed to carry out the purposes of some particular regulatory statute or statutes. The case of Bailey v. Van Pelt, 78 Fla. 337, 82 So. 789, grew out of a criminal prosecution against Bailey wherein he was charged with violating certain rules and regulations made and promulgated by the Livestock Sanitary Board. The statute creating the board gave them authority to make and enforce rules and regulations for carrying out the provisions of the act, and provided that violation of such rules and regulations should constitute a misdemeanor. The judgment of conviction was affirmed. In that case, which is a leading case in this State, it was held that when authority is given by statute to accomplish a stated governmental purpose, there is also given by implication the authority to do everything necessary to accomplish the purpose that is not a violation of law or public policy. In the opinion of Mr. Justice WHITFIELD in that case it was said:

"The Legislature may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an unrestricted discretion in applying a law but it may enact a law complete in itself designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose. This principle of the law is peculiarly applicable to regulations under the police power, since the complex and everchanging conditions that attend and affect such matters make it impracticable for the Legislature to prescribe all necessary rules and regulations. Authority to make rules and regulations to carry out an expressed legislative purpose, or for the complete operation and enforcement of a law within designated limita-

tions, is not an exclusively legislative power. Such authority is administrative in its nature and its use by administrative officers is essential to the complete exercise of the powers of all the departments.

"The exercise of some authority, discretion or judgment may be incident or necessary to the performance of administrative or ministerial duties; but such authority, discretion or judgment is subject to judicial review; and it is not among the powers of government that the Constitution separates into departments." (Citing numerous authorities.)

It was also said in the above cited case that administrative rules are not raised from an administrative to a legislative character because the violation thereof is made punishable as a public offense. This case has been followed by numerous subsequent cases, among them Richardson v. Baldwin, 124 Fla. 233, 168 So. 255, involving the rules and regulations of the State Plant Board, which Board was created by an Act passed in 1927. In that case it was said:

"Administrative officers must necessarily be given some latitude in the administration of an Act of this character. The paramount consideration is saving the industry threatened, and so long as the Act is administered with this purpose in view and with due respect to individual rights, the officers whose duty it is made to execute it will not be interfered with. Like constitutional guarantees, such Acts must be administered with reference to the public as well as the individual and when these interests run counter that of the individual must give way."

See also Pridgen v. Sweat, 125 Fla. 598, 170 So. 653; Williams v. Kelly, 133 Fla. 244, 182 So. 881; State v. Rose, 122 Fla. 413, 165 So. 347; Mayo v. Texas Co., 137 Fla. 218, 183 So. 206; State v. Culbreath, 14 Fla. 634, 192 So. 814, and State v. Young, 76 Fla. 180, 79 So. 692. And in Arnold v. State, 140 Fla. 610, 190 So. 543, it was held that under a statute making a broad declaration of policy with reference to the establishment and support of a system of public free schools and authorizing the State Board of Education to promulgate the rules and regulations to effect such a system, rules promulgated under the Act, so long as they are shown

to conform to its general purposes, are not violative of constitutional provisions relating to the division of powers and establishing the legislative department of the State government. And in the case of Miami Bridge Company v. Miami Beach Railway Co., 152 Fla. 458, 12 So. (2nd) 438, it was held that the Legislature could regulate the rates of public utilities through the instrumentalities of boards and commissions authorized to establish such rates and charges as are reasonable. In this general connection see also 11 Am. Jur. 960-965.

It is needless to say if the Legislature can thus authorize administrative boards and commissions to adopt rules and regulations to carry into effect the objectives of the particular statutes, surely the people by constitutional amendment can delegate such rule making power and with even greater force and effect. See the opinion of Mr. Justice TERRELL in the recent case of Holland v. Watson, 153 Fla. 178, 14 So. (2nd) 200. Thus the people, when acting through a constitutional amendment set up an administrative commission, such as the one we are dealing with here, to accomplish certain public purposes, it can clothe the commission with power to adopt rules and regulations to carry out the purpose of the amendment which would have the effect of repealing any and all statutes relating to the subject matter which are in conflict with the purpose and intent of the constitutional amendment and with the rules and regulations adopted pursuant thereto. See State ex rel. West v. Butler, 70 Fla. 102, 69 So. 771.

A general rule is that no one provision of the Constitution is to be separated from all the others, to be considered alone, but that all provisions bearing upon a particular subject are to be brought into view and to be so interpreted as to effectuate the great purposes of the instrument. Thus a constitutional amendment becomes a part of the Constitution and must be construed in *pari materia* with all of those portions of the Constitution which have a bearing on the same subject. But a somewhat different rule prevails if a constitutional amendment conflicts with pre-existing provisions. In 11 Am. Jur. Sec. 54, p. 663, it is well said:

A new constitutional provision adopted by a people

already having well-defined institutions and systems of law should not be construed as intended to abolish the former system, except in so far as the old order is in manifest repugnance to the new Constitution, but such a provision should be read in the light of the former law and existing system. Amendments, however, are usually adopted by the express purpose of making changes in the existing system. Hence, it is very likely that conflict may arise between an amendment and portions of a Constitution adopted at an earlier time. In such a case the rule is firmly established that an amendment duly adopted is a part of the Constitution and is to be construed accordingly. It cannot be questioned on the ground that it conflicts with pre-existing provisions. If there is a real inconsistency, the amendment must prevail because it is the latest expression of the will of the people."

In view of the fact that the information was legally sufficient on its face to charge a criminal offense, the circuit judge should not be held in error, in this habeas corpus proceeding, for remanding the petitioner to the custody of the sheriff. The constitutional amendment, the implementing statute and the duly promulgated and certified rules of the Commission were all before him, and under them the facts alleged in the information showed a violation of said rules 9 and 13, which rules were at least prima facie valid and within the intent and purpose of the Constitutional amendment and the statute. So on its face the information was valid and the detention of the petitioner lawful.

We do not overlook the fact that the petition for the writ, in addition to the grounds above discussed, also alleged that Rules 3, 9 and 13 discriminated against commercial fishermen and in favor of game fishermen, in that for thirty years the use of drag seines and nets by commercial fishermen in fishing for cat-fish, bream and crappie in the waters of Lake Kissimmee, had not reduced the quantity of game fish; that this kind of fishing removed from the lake large quantities of "foul" fish, not protected by the statute, which species were destructive to game fish; and that petitioner proffered testimony tending to support these allegations, which proffer the court denied. No assignment of error

was based on this ruling of the Court, and no authorities have been assigned by learned counsel to show that such a ruling in habeas corpus proceeding was erroneous. Undoubtedly, in a proper proceeding, the reasonableness vel non of the rules and regulations of the Commission, and whether or not they are within the intent and purpose of the constitutional amendment, are subject to judicial review; and even in a habeas corpus proceeding to test the legality of an information, under which petitioner is held in custody, charging a violation of one or more of the Commission's rules, if it appears on the face of the information that the rule or rules involved are clearly beyond the scope of the Commission's lawful power to adopt, the court could discharge the petitioner. But such is not the case here. When it is necessary to resort to evidence aliunde to show that the Commission's rule is arbitrary, discriminatory, unreasonable and not justified by the language and the intent and purpose of the constitutional amendment creating the Commission, there are other and appropriate remedies, such as injunction in which the Commission can be made a party defendant and given an opportunity to introduce evidence and be heard, and which will afford the complaining party, if he be entitled thereto, to adequate and complete relief. It is not necessary for us to here express any anticipatory opinion on the admissibility or suffiiciency of the evidence proffered on the habeas corpus hearing as a defense, or otherwise, on the trial—if the petitioner below should offer it later, if and when he comes on for trial before a jury. It does not appear that the court below was in error in its ruling in this habeas corpus proceeding, to which neither the Game and Freshwater Fish Commission, nor the members composing it, were parties. As to the scope of habeas corpus proceedings, see, in addition to the cases already cited, the following: Lehman v. Sawyer, 106 Fla. 396, 143 So. 310; Jones v. Cook, 146 Fla. 253, 200 So. 856; French v. Turner, 103 Fla. 425, 137 So. 521; Ex parte Lewis, 101 Fla. 624, 135 So. 147; Quigley v. State, 99 Fla. 933, 127 So. 898; White v. Penton, 92 Fla. 837, 110 So. 533; Hardee v. Brown, 56 Fla. 377, 47 So. 835; Bronk v. State, 43 Fla. 461, 31 So. 248; Ex parte Prince, 27 Fla. 196, 9 So.

659; Ex parte Bowen, 25 Fla. 214, 6 So. 65; Srarw v. Vasquez, 49 Fla. 126, 38 So. 830, Wilk v. Bartow, 86 Fla. 186, 97 So. 407; Burrows v. Moran, 81 Fla. 662, 89 So. 111; Haas v. Honkel, 216 U. S. 462, 54 Law ed. 569; 12 R.C.L., 1242-3; 25 Am. Jur. 156, 157, 164, 175, 183.

No error appearing, the judgment appealed from is Affirmed.

BUFORD, C. J., CHAPMAN, THOMAS, ADAMS and SEBRING, JJ., concur.

18 So. (2nd) 752          June Term, 1944
July 7, 1944          Division B